The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning. Please be seated. Mr. Williams. Good morning, Judge Wilkinson. May I please the Court? Your Honor, this is a capital sentencing case where counsel failed to meet the basic standards of competency, and it ended up impacting Freddie Owens in ways that are now clear from this record. Capital counsel was appointed in January of 2006 for a September 2006 trial. And then, Your Honors, they waited. They waited six months to meet their client for the first time. They waited nine months until the eve of trial to send letters of introduction to experts. The lawyer who was responsible for putting on the mitigation case at sentencing hadn't even read the social histories or the institutional records in this case that was going to focus in part on future dangerousness in prison conduct. And in the midst of this chaos that was brought about by counsel's failure to exercise basic levels of diligence, an expert said just before trial three things. First, we need a continuance. I'm looking at this record and learning things about the use of psychotropic drugs that I wasn't even aware of. Second, I need a social history. And third, we need a neuropsych examination because I want to rule out that his issues aren't arising from brain damage. Now, what we know, Your Honor, is... The district judge, who did a pretty thorough job with this, thought you put on a very complete mitigation case. Your Honor, with respect to, in particular, what was claimed seven in the district court and what's our third issue for appeal right now, the district judge's analysis is all of three pages. And with respect to the district judge, the judge committed two very serious... No, but the point that you were making is that the mitigation case was inadequate. That's correct, Your Honor. Right, and all I can say is, you know, the opposing brief says you can take issue with this. The third sentencing was before the jury and said that Owen's parents were violent toward him. Owen's would have to protect his mother and his stepfather. Owen was forced to fight in the neighborhood. Owen's family was regularly violent toward one another. Owen's mother was abusive and neglectful. Owen's witnessed horrific violence growing up. It just went on and on. And it was more extensive, in fact, than many of the mitigation cases we see in capital cases. So the jury here was presented with an unmistakable picture that this individual had a perfectly horrific childhood. That point was made and that mercy and leniency should be granted on the basis that his childhood was a house of horrors. And the problem is that the jury did not buy that. Judge Wilkinson, it's much worse than that because trial counsel didn't put on what's probably the most powerful piece of mitigating evidence that they failed to investigate, develop, or present. And that's what we know now about Freddie Owens, that he has brain damage in his frontal lobe, that this brain damage. Where was that in the record before this most recent iteration? I mean, they hired three experts, did they not? None of them ever indicated to the lawyers any concern about brain damage. And I recognize that lawyers can't completely abdicate their responsibilities to the experts, but what was it in this record, particularly from the experts that should have led the lawyers, including the post-conviction lawyers, I guess, which is where this comes up, to somehow understand that they needed to look at this particular issue? Right, and Judge Diaz, what we know is, first, one of those experts was just the treating physician from the prison. He said that he'd never reviewed any records that Mr. Owens had had. He was medicating Mr. Owens when he needed medication, so he wasn't an expert in the litigation sense. The second expert is the one who I was talking about before, Judge Schwartz-Watts, who a couple of weeks before trial is the one who told trial counsel, get a continuance and we need a neuropsych. And then it was that third expert, Judge Diaz, Judge Brawley, Dr. Brawley, who said with regard to the federal habeas proceedings, had I had access to medical records indicating that there was a history of seizures, had I known that? Well, the opposing brief on pages 20 to 23 details the testimony, and part of that testimony went to Owens having lifelong problems with brain functions and certain orders like ADD, attention deficit disorder. So your opposing counsel is contending that indeed evidence of brain damage was presented, and they've quoted some of it in their brief. Your Honor, in the federal habeas proceedings, we were able to present the testimony of two doctors who said not based on social history or not based on surmise, but as a result of full scan, MRI scans and PET scans, that they can identify the structural and functioning damage to Mr. Owens' frontal lobe. This isn't just about, you know, a difficult childhood. This isn't just about ADD and behavioral issues. The prosecutor said in closing argument that Mr. Owens is an evil person. What this evidence would have done is it would have shown, as this court found in Sterling v. Williams, there's a cause and effect relationship between these medical deficiencies that Mr. Owens had that were never investigated and never presented. He wasn't bad, Your Honor. He was broken, and the jury never had that information because counsel was asleep at the switch and never developed it, Your Honor. And we know, in terms of prejudice here, because the undisputed record that was before the district court on summary judgment at JA 4231 is that Dr. Brawley said if she had been given information regarding previous seizure activity combined with her findings on temporal lobe deficits would have caused her to recommend a full neurological evaluation. And where was that particular evidence regarding seizures? Is that in the record? That evidence is in the record in Dr. Woods' report, Your Honor, but the evidence was originally drawn from South Carolina Department of Correction records that weren't read by the lawyers. When you say the evidence is in the record, the statement from Dr. Woods is in the record, but where are the actual medical records? The actual medical records would be with the South Carolina Department of Correction. So you're relying on the statement from Dr. Woods who looked at the records or it's just surmising that there might be something in there? Your Honor, we're relying on the statement from Dr. Woods that she looked at the records and saw that there was a reference to a history of seizures. And the fact that the underlying records aren't in the record leads me to another point. That's that we were denied an evidentiary hearing in this case, Your Honors, and we can talk about the Martinez v. Ryan gateway and what the standard here is, but the reason the district court denied us that hearing was because it determined that Mr. Owens hadn't proved up his claim of ineffective assistance of counsel. Did you bring all this up on state post-conviction review? Not the brain damage point, Your Honor. Why not? It wasn't brought up there because post-conviction review counsel was also ineffective. Well, I thought ineffectiveness claims really related to trial and to appeal. Under Martinez v. Ryan, Your Honor, under the South Carolina system, these claims couldn't have been brought up on direct appeal, and therefore— But Martinez talks about the difference between elaboration of the claims. I mean, we talk about the 2254D standard, and Martinez draws a line and talks about the difference between the elaboration of a claim made in state court and a fundamental alteration of a claim made in state court, which is what you need to do to get out from the 2254D, I suppose. But you can always elaborate on a claim in state court and say, well, this should have been put in, this should have been put in, and everything. That could go on endlessly, and the Supreme Court was concerned about it. But this doesn't seem to me to be in the nature of a fundamental alteration because there was evidence of brain damage that was brought in, and indeed a great deal else. So, you know, I just do not see how we can get out from under 2254D and the deference that's owed to the state court consideration. And in fact, the state courts treated this individual very fairly. They reversed on the first two death sentences to make sure that this proceeding was done right. Your Honor, those first two proceedings aren't relevant to what happened at his death penalty sentencing. No, they're relevant only in this sense, that the state court weren't just sort of whisking it or brushing it off. No, that they were taking it very seriously. Your Honor, part of the issue in why we're doing this... This seems to me respectfully like what we sometimes see in these ineffective assistance of counsel claims, which is a great deal of Monday morning quarterbacking. And that's a lot of what's going in here. It was a comprehensive mitigation case that was put on part of which concerned brain disorders. And, you know, if something this comprehensive is inadequate, then it's hard for me to know what would be. Your Honor, I take issue with that statement because this court has recognized... Well, of course you do. I would expect you to. Your Honor, it's because this court has recognized that medical evidence of brain damage, it's not mitigation per se the way that intellectual disability is, but this court had noted that it explains cause and effect in a way that other social history or childhood history mitigation evidence does not. And at the trial court, as to whether or not this is a new claim or whether it's an elaboration, there was no evidence developed, investigated, or presented that there was this medical problem with Mr. Owens at his third sentencing. Mr. Williams, you're making a very interesting argument, but it seems to go mostly to performance of counsel. And I haven't heard too much of your prejudice analysis. You know, we have a lot of evidence in this case. We have evidence that Dr. Brawley, who you've referenced, has said that Mr. Owens performed pretty well on memory tests that she gave him. Dr. Schwartz-Watts was saying that some of the medications that you're referencing were given, even though they're very serious medications, that they were given in his case, I think, primarily for impulse control, weren't they? So where is the prejudice? You know, we have here, I mean, the glaring fact that he killed his cellmate, you know, in terms of future dangerousness. How do we factor what you're talking about with counsel's performance and translate it into prejudice sufficient to meet the standard necessary given the extreme evidence of his conduct while in prison? And I'd say on that, Judge Keenan, because of the nature of the information that wasn't investigated, that is a full-scale neuropsych exam that actually shows medically as a matter of science, not as a matter of social history, not as a matter of what adversity he went through as a child, but just as a matter of objective science that he had these issues that impeded his impulse control. So you're saying it's per se prejudicial then, essentially, aren't you? It's not per se prejudicial, Your Honor, but as I said, this court has recognized in Sterling v. Williams in the context of fetal alcohol syndrome that this sort of medical evidence explains cause and effect in a way that social history does not. The ABA guidelines and other Supreme Court cases, like Terry Williams, for example, have recognized that medical evidence is a brain damage, not just talking about it. Right, but I'm talking about in this case, given the other evidence, point us to the prejudice, since you agree it's not per se. That's right, Your Honor. What is the other evidence of prejudice? The other evidence is, had this information, had counsel been able to go before that sentencing jury with scans of Mr. Owen's brain and said, he's not bad, he's not evil, he's broken, and that's why he's done this, then that would have been information that was withheld from the jury here that, because it was withheld, interfered with the adversarial process and undermines the reliability. That still sounds like a per se case. You're not, I guess, addressing the context of what the evidence was in aggravation, including the particular, that very, very horrific killing in the jail cell. Well, I think if it sounds like a per se case, I should be a little bit more clear. There was horrific, aggravating evidence that was presented at this sentencing. The social history evidence that was in mitigation might not have explained it in a way that the medical evidence does, Your Honor. And that's what I'm saying, is with this jury hearing that he's evil. The fact that he tortured and murdered his cellmate when he was awaiting sentencing, that came in, did it not? That's right, Your Honor. So why, I think you have a difficult road both on performance and prejudice, but why wouldn't something like his overall record, which is really quite heinous, and something like murdering a cellmate while awaiting trial, why wouldn't that go, that's got to be relevant to whether there's a reasonable probability, not possibility, a reasonable probability that the result would have been different. And I think the answer there, Your Honor, is because this medical evidence, unlike social history evidence or other evidence, isn't seeking to excuse what Mr. Owens did. But what it does is it explains it. It contextualizes it for the jurors to understand that he's not an evil person. This sounds to me like the very thing that Martinez Court was concerned about, which is the infinite prolongation of these sorts of proceedings by elaborating claims, not fundamentally altering, but by elaborating claims, that this could have been brought in and this could have been brought in. And it's always possible, always, to think of some piece of evidence that should have been brought in. And you try to make it seem as if that completely changed the nature of the case. And that's hard for me to believe, given all the evidence, both as to brain dysfunction and childhood problems and everything, that there's a fundamental alteration in what was before that jury. But at any rate, you have time for rebuttal, but I want to let my colleagues, if they have further questions, to ask them of you. Otherwise, we will hear from you on rebuttal. Judge Keenan, Judge Diaz, thank you. Thank you, Your Honor. Judge Brown, let's hear your view. May it please the Court, we're here today because Mr. Owens murdered Ms. Irene Graves, November 1, 1997. She was a clerk and she was a mother and she was innocent of any wrongdoing when she was killed. Could you keep your voice up, please, Ms. Brown? Absolutely. I think it might help if you move the microphone down just a little bit so that you're speaking right into it. Yes, sir. That way, because we want to hear you. Thank you, sir. I appreciate that. He has been sentenced to death three times now, and during the sentencing phase in his first trial, he did kill a cellmate really brutally, very brutally. And those details he gave us in his own confession, and that's coming in no matter what. Now, the conversation this morning talked a little bit about the case in aggravation. One thing I'd like to point out is that counsel in this third proceeding was very aware of this information, particularly about the inmate murder coming in. In fact, counsel, Mr. Godfrey said that was sort of the, quote-unquote, elephant in the room. That was coming in. He was very, very aware of that. And that led him to look at different items a bit differently. For instance, in the D.J.J. records, he looked at D.J.J. records. Now, in the first issue before this court, Mr. Owens is suggesting now that there was a sexual assault that should have been brought out, that counsel was ineffective in that mitigation case because he didn't find that. However, this was not a clean slate case. We had six different lawyers, three different mitigation teams. Well, he denied that he was ever the victim of a sexual assault, and so that's a tough road for counsel to do. There was a basic problem in this case from the standpoint of Mr. Owens' counsel, and that was when you start digging into his problems and into his past, you uncover more and more evidence that you wouldn't want the jury to hear. In other words, there's just a trail not only of murdering his cellmate, but there's just a trail of brutal acts. And to the degree that you go more and more into his past, into his childhood, into his behavior while in prison, it's sort of hard to do that surgically because it's intertwined and interconnected with some very brutal behavior, and it's not a thing that counsel wouldn't want to dwell on. This is what was hard about the case, is that the more you look backwards and try to explain things, the more horrific what needs to be explained becomes, and there's a conundrum there for counsel. I can appreciate the difficulty of someone saying, well, let's talk about the mitigation in his background. Well, but the mitigation is mitigating certain things that you just don't want to play up. That's the problem. And I think Mr. Godfrey sort of encapsulated that in his response when he was reading the DJJ records. He had to admit everything in there showed that Mr. Owens was a predator. He was not a victim. And that's kind of stuff that he did not want to add on to what was already a highly aggravated case. But he also went to his experts and talked to his experts about what to be done, what should be done at this point. Ms. Brown, can I ask you about the neuroimaging issue because that's one of the things that gives me a little bit of pause in this, in particular what your colleague mentioned about Dr. Brawley's reassessment of the evidence that he indicated that he would have suggested neuroimaging if he had been made aware of these records of seizures and other medical issues in Mr. Owens' prison records. So why isn't that enough to raise a concern, the fact that that evidence appears to have been available but was never considered by the defense team, particularly since the expert now says that had he been made aware of that, he would have suggested the very type of testing that your opposing counsel says is now fairly standard in these cases? Well, the district court and the magistrate, they were very careful about going over the records. And here's the problem. That starts from a false premise. There was no seizure disorder. The record shows that Dr. Wood was seizing on the idea of Depakote being a seizure medication. Seizing on the idea of what now, what you said? Depakote, the use of Depakote, the medication. Okay. And that medication is actually referenced in the SCDC records. Dr. Schwartzwatz talks about that. That medication was given by the SCDC doctor to calm Mr. Owens. I want to be sure I understand this. You take issue with the premise that there was a record or evidence of seizures. Is that your position? That's correct. It's a false premise that starts from that. And also, it doesn't invalidate any of the testing that Dr. Brawley did for this particular proceeding. It doesn't invalidate it. At most, if you take that in the light most favorable to Mr. Owens, she might have said, I would like another test. That doesn't mean that any of her testing is wrong, false, or incorrect in any way. So you still get back to what was presented to the jury, and Dr. Brawley did not find significant problems with his functioning. Some limitation, learning disability, absolutely. But not this idea that there is a portion of the brain that is so damaged that he's not responsible. But I would like to take a few minutes to talk a little bit more about the prejudice in that particular case, because we have talked about what has happened, his actions, but we also need to talk about what he's done in prison that was positive that they tried to bring out, and that is that he could teach others to read, that he had learned languages himself, that he had increased his IQ. So when we talk about brain damage, we also have to consider that that information is also before the jury. So that is his level of functioning. There are very unique cases out there where portions of the brain are removed, but someone still functions correctly. His functioning was tested, and that information has never been shown to be invalid in any way. So is what you're saying is that putting on the evidence of brain damage would have presented, was a strategic decision that would have presented an inconsistent case before the jury in the sense that he was functioning in certain aspects at a fairly high level, and that it would have, that counsel made a, within consultation with the experts, made a strategic call not to put that in because it would have highlighted an inconsistency between that and the positive evidence. The district court resolved that counsel did have some evidence that would suggest some damage. That was from Dr. Evans in a prior proceeding. And the district court was swayed to a certain extent that they didn't use that particular evidence to try to go into some kind of brain damage. It wasn't accepted as being particularly mitigating because there was a death sentence that arose from that. I also want to go back to what counsel said in the PCR hearing, and that is that he didn't want to use Dr. Evans. He didn't want, in this bad of an aggravated case, he didn't want the jurors to think, quote, smoke and mirrors were being presented. And so there was that idea that you could go too far with this because you did have information from your own experts who had tested, and those tests are valid, that he was doing better, that he was learning, he had a decent IQ, he was teaching other people in prison how to read. He was reading himself. He had an increased ability. So all of this goes together, and the district court considered that in saying that this is not a substantial claim because you had to get the substantial claim to get to a Martinez excuse. But the other thing that the district court found was very important was that none of the doctors had requested neuroimaging. There's nothing in here, in this record, in the Martinez presentation, that suggests that had an image come back with a certain quality or certain deficit that a new diagnosis would be made. That's not there. And I wanted to go back a little bit and talk about the difference between Williams v. Sterling and this case. And one of the big differences is that they did have these doctors. In Williams v. Sterling, you had a specific condition, the fetal alcohol syndrome, and the district court said that condition was proven. You're talking about the three experts that you hired. Right, these experts. And of those three experts, am I to understand that none of the three experts recommended neuroimaging?  Dr. Schwartz brought in Dr. Brawley. The question is can you expect counsel, as a matter of the performance prong, to override the recommendations of the three experts? That's right, because counsel should take some information from his experts and make his decision. That's working hand in glove. That's not abdication of his responsibility. And that's what the district court found dispositive in this Martinez claim. You had that evidence. They didn't use it. They didn't use it for a very specific strategic decision as far as evidence coming from Dr. Evans. And then no doctor or expert requests that imaging. But I would go one step further and say there's nothing in the record that shows that anything was wrong with the testing that they gave or that some image would be per se prejudice. That has never been accepted. And some of these types of reports have come in in other cases in South Carolina and that's the way that it has been addressed, that these are not per se films, per se prejudice films, when you find a doctor that says, oh, I think this area has less volume or this area is dense or this area is damaged in some point. Medically speaking, you still have to go to function. Function is the major part of brain damage that you want to get to. If that brain damage does affect functioning, then that's a stronger case. That hasn't been shown here either because, again, Dr. Brawley did the accepted neuropsychological testing that goes specifically to function. I'd also like to spend a few minutes on the claim that you needed an expert for the background information. Mr. Owens has said that he has some concern that there wasn't enough time. But, again, we're not writing on a clean slate. And counsel very much had access to the prior proceedings and transcripts that he had access to prior counsel's files. He used that. He also brought in his new experts because he wanted a bit of a different case. He had already been sentenced to death twice, so he wanted a new presentation. But he didn't just throw everything out. He still put Marjorie Hammack up. When you go back to Strickland v. Washington, which is the Fountainhead case in all of this, I reread it for elucidation every so often. And in that seminal decision, Justice O'Connor makes the point that counsel has latitude in how they put on a case. And that's a thread that goes all the way through her decision, and that is that why do we hire counsel to begin with to exercise judgment? And the judgment here, as I understand it, and it has to be a judgment within the realm of reason, and the judgment here was that none of the experts would have recommended this particular test. But then there was an additional problem, and that is if you put on this evidence of brain dysfunction and you lay that aside, the things that you've talked about, the teaching that he's doing and the level at which he's functioning, all of a sudden you get an inconsistent case, and the prosecution is going to make mincemeat of that in closing argument. And so counsel says we've got a task of maintaining our credibility with the jury on this kind of thing, and we can't run into ourselves and meet ourselves going and coming. You may disagree with that, but if you go back to what Justice O'Connor was saying in that opinion, this is exactly the kind of judgment that that's what lawyers do. They exercise judgment, and this is always perfect judgment? No, but in this case it was a decent judgment. That's the thing. And it wasn't post hoc rationalization either. This is something that counsel said at the PCR. I wanted to put on a different kind of case, and I wanted consistency. I didn't want smoke and mirrors, a suggestion of smoke and mirrors. It's not a post hoc kind of thing. Yes, sir, that would be correct. That would be absolutely correct. And you do have counsel in a case exercising their professional judgment, and that includes investigation, and it has to be reasonable. One thing that comes out, I think, in a lot of the capital cases is this idea about mitigation, and is it complete? Is it complete mitigation? That's not the test. The test, the Sixth Amendment test, is whether counsel's investigation was reasonable, which includes some of those decisions on where to go, how to go, and what to present. And one of the biggest problems with trying to think of mitigation as this concrete set of information is that it is impossible to determine what is in that concrete set of information. That's impossible because, as Judge Wilkinson points out, there are different ways to try different cases. Different things may be important in different ways. Well, one of the things that I hear frequently is sometimes when counsel does introduce evidence of brain function or this or that, then the claim is that counsel made a mistake because it opened the door to prosecutorial rebuttal evidence which was just devastating. Yes, sir. And so you can get whipsawed in this business by introducing or not introducing or what have you. And also introducing the aggravating evidence because if you take the premise that a brain is damaged, it's not a choice, it's the damaged brain, then you have made that person per se dangerous. That's not going to help a case for life. So there are a lot of considerations that counsel has to make a determination on in going forward. Ms. Williams, you're a... I'm sorry, Ms. Brown. Mr. Williams began his argument with sort of a description of how it appeared that counsel and its team was a bit disorganized. They sort of had some trouble in the briefs of justice as well, some dissension in the ranks, a bit of dysfunction maybe. They were rushed for time. They had to ask for a continuance in order to get additional information together. And I think it's fair to say that the mitigation case that was presented at this trial was perhaps not as well-developed as some of the other earlier proceedings, but of course that's not the test. But how are we supposed to assess that kind of sort of evidence to the extent it exists in the record about this sort of disorganization and just not coming together as a team? Well, I would suggest that when we look at the e-mails, and there were references to the e-mails from Mr. Godfrey to other members of the team, when we look at that we have to look at the end result and we have to look at the PCR testimony. In other words, we have to look at it in context. And in context I would suggest that it shows the opposite of what Mr. Owens argues. It shows counsel was very active, that he was corralling information, that he was managing his experts, and at the end of the day when he presented Ms. Hamrick he said that she did a good job. And one reason he wanted to keep her, even though he would have, I think he used the term, pulled the plug, if she had not come up to speed before trial as far as preparation and talking to him, he wanted her there because she had so much information. She had worked this case before and she knew it. And bottom line, she did a good job. It is a different presentation. It is different in part because that is another strategic decision. They wanted a different case. Two other death sentences had already been handed down. And this is the type of evidence that goes to the last point, I believe I touched on previously, very briefly, this other expert to present it, that Ms. Hamrick should not have been presented in this particular proceeding, that perhaps someone like Dr. Garbarino should have been. But this is not particularly difficult information to understand. As the United States Supreme Court said, I see that I'm out of time. May I finish with one thought? Thank you very much. Thank you. I appreciate it. Good morning again, Your Honors. During my colleague's argument, Judge Wilkinson had mentioned that this case seems like just the sort of strategic decisions that Strickland endorses. But Strickland assumes that when a lawyer is making those strategic decisions, that he's fully apprised of the facts. And this court's case in Hinton, for example, said that counsel is charged with being familiar with documents that are readily available that are necessary for his client's case. The record on this case, which comes to this court on summary judgment, is undisputed. The trial counsel here had never reviewed the institutional records that said there was a history of seizures. And in case there's any dispute about this, Judge Diaz, I have the records. You have in the record here the expert report, which mentions history of seizures. I don't think there was... there shouldn't be any dispute that these prison records, which would be available in an evidentiary hearing if it's granted in this case, say history of seizures. This isn't just a question of the doctor surmising that from the medications that Mr. Owens was prescribed. But it gets to a larger point. In order for this court to deny Mr. Owens' claims, it would have to say that this case isn't even substantial. And what you've heard in South Carolina's argument was that counsel was looking for a different kind of case. It had a different kind of case available to it where all of the factual predicates would have been available from the record with just the basic diligence of reviewing his client's institutional records, hiring experts in time for them to give the proper opinion. In this different case, it's not per se mitigation. But what Judge Wilkinson was saying about having to be surgical with a client like this, where there's so much on both sides of the issue that if you open the door to something, you might be concerned about something else, the different kind of case is to say, not that we're going to balance the bad things he's done with the good that he's done in prison. All I was saying was that there was voluminous evidence put on that would have allowed at least one juror, had he or she been so inclined, to recommend life. That's all it takes is one. But there was, before the jury, there was a lot of evidence which was designed, which was aimed at one point, which was to present Mr. Owens as a sympathetic figure who had essentially been turned to a life of violence by a perfectly horrific upbringing, and for counsel to concentrate on the violence and disorder and abuse of his childhood,  as opposed to brain dysfunction, of which there was some brought in. But I think counsel was right that their best shot after two prior death sentences was to concentrate on that childhood. And that seemed to me to be a valid point of emphasis, given the fact that they had three experts. They didn't recommend... The three experts didn't recommend neuroimaging. You can't expect the lawyer to simply... If they had overridden the recommendations of the experts, that would have probably presented another difficulty. And there was this problem of consistency, introducing evidence of brain dysfunction, when there's an awful lot of evidence that he's functioning at a fairly high level. And the jury... You know, the one thing a lawyer can't do is you can't lose credibility with the jury. And the evidence that you're talking about, it ran that risk. Your Honor, there was no overriding of the decisions of the experts here. I heard that during the colloquy with South Carolina counsel. But the record that comes up to this court on appeal is there was the prison treating physician, there was Dr. Schwartz-Watts, who said weeks before trial was supposed to begin, I need neuropsych. And there was Dr. Brawley, who was hired, not given institutional records, and who has said in undisputed testimony that comes up to this court on summary judgment against us, that had I known about these documents that were readily available, I would have ordered full neuropsych. And we know what the results of that neuropsych would have been because we had them in the federal habeas proceeding. This wasn't a strategic choice, Judge... All I can say is, there is simply no proceeding on this green earth that you can look at a record, you can always say, always, counsel should have done this or counsel should have done that. Whenever we review things in retrospect, we can always think of could have, should have. Whenever you think of the past, you think of could have, should have, ought to have. But I don't think... I think you have to put yourself in the shoes of the people who were there at the time and confronted with the case. And frankly, as the PCR court found and as the district court found in a very thorough opinion, these folks did an incredible job. And even if you get past the performance prong of things, it's difficult to deal with the reasonable probability test on prejudice because there's lots of evidence that indicates this individual could be a continuing threat because you never know when there's going to be a recurrence of something like happened with his cellmate while he was awaiting trial. So there's a problem with the performance and the prejudice prong under 2254D. And I see my red light is on. May I respond briefly, Your Honor? You sure can. I agree with you that there's always a problem with looking backwards, but that's why the Supreme Court and this court has set minimum standards for the performance of counsel. And in Winston, for example, this court said two things that are relevant here. You need to be familiar with the readily available records that are necessary for your case, and counsel here was not. Well, let me ask you about that. So let's assume that what you just said earlier was correct and we'll have to go back and look, that there was evidence of seizure, and Dr. Brawley says, had I known that, I would have run these tests. But, of course, he wasn't... They ran a battery of tests, didn't they, on your client? There were three doctors involved here, and none of it pointed to this necessary neuroimaging of the brain. Are you saying that the only logical and most compelling evidence that would have led a doctor to do this test was the evidence of brain seizure? Is that what you're saying? Your Honor, that's what this doctor said. On the record that comes up to the court on summary judgment. And the district court had never grappled with that. That is, it's undisputed that Dr. Brawley said, had I known this, coupled with what I knew about his temporal load functioning, I would have ordered neuropsych. And that gets to the point that I've made about a hearing, Mr. Owens has never had an evidentiary hearing on these issues, on whether or not there was deficient performance or whether or not there was prejudice. It's coming up to this court on summary judgment, and the district court had to rule that there wasn't even a substantial claim because it was the only way to avoid grappling with this undisputed evidence. And that's why we'd ask the COA standard, substantial claim, is the same as the Martinez v. Ryan standard. And that's why we're asking, Your Honors, for an evidentiary hearing to resolve these issues. Thank you, sir. And I see that you're court-appointed, Mr. Williams, and I want to express the appreciation of the court for the job that you've done and the care that you've taken with this case. Thank you, Judge Wilkinson. Thank you, Your Honors. We'll come down, brief counsel, and then we'll move into our next case.
judges: J. Harvie Wilkinson III, Barbara Milano Keenan, Albert Diaz